UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREA RAILA, | |
| Plaintiff, | No. 19 C 7580 |
| v. | Judge Thomas M. Durkin |
| COOK COUNTY OFFICERS ELECTORAL BOARD, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

An adage known as "Hanlon's Razor" says, in its most polite form, that we should not "infer malice from conduct that can be adequately attributed to incompetence."[1] Like its more familiar cousin Occam's Razor, which says that all things being equal, the simplest explanation tends to be the correct one, Hanlon's Razor is a principle for eliminating unlikely explanations for a phenomenon. These "philosophical razors" are hardly foolproof, but an adage doesn't get a name by being wrong all the time.

With a freshly polished Hanlon's Razor in hand, the Court turns to the instant case. On November 18, 2019, Plaintiff Andrea Raila sued the Cook County Officers Electoral Board, the Chicago Board of Election Commissioners, and several members of both entities. Raila alleged that Defendants' conduct in the leadup to the 2018 Cook

---

[1] *Liberty Life Assurance Co. of Boston v. Devillavilla*, No. 6:12-cv-1320, 2014 WL 309084, at *5 (M.D. Fla. Jan. 28, 2014).

1

County Assessor Democratic primary, when Raila's candidacy was disqualified and then reinstated days before the primary, violated her due process rights, right to vote, and right of association. This Court dismissed Raila's complaint, finding that much of it was barred by res judicata, and that she had failed to state a claim otherwise. R. 37. Raila sought leave to file an amended complaint, and on August 11, 2020, she filed the operative Third Amended Complaint ("TAC"). R. 56. Raila once again asserts violations of her First and Fourteenth Amendment rights, in addition to violation of the Illinois Election Code.

The matter is now before the Court on motions to dismiss the TAC filed by the Chicago Defendants (the Chicago Board and its members Marisel Hernandez, William Kresse, and Jonathan Swain), R. 68, and by the Cook County Defendants (the County Board and its members David Orr, Dorothy Brown, and Kimberly Foxx),[2] R. 74. For the reasons stated below, Defendants' motions are granted.

## Background

The Court's prior order summarized Raila's efforts and obstacles in her pursuit of the 2018 Democratic nomination for Cook County Assessor. R. 37, at 2-6. For present purposes, the story picks up after the Cook County Board disqualified Raila as a candidate for Assessor in February 2018. After the Circuit Court of Cook County

---

[2] Raila previously substituted Karen Yarborough as a named defendant in place of David Orr, whom Yarborough replaced as Cook County Clerk in 2018. R. 37, at 6 n.5. The TAC case caption reinserts Orr as a defendant in his official capacity as Cook County Clerk, but the body of the complaint identifies Yarborough as the proper party. R. 56 ¶ 20. Two other parties have also changed since Raila filed the TAC: Iris Martinez replaced Dorothy Brown as Clerk of the Cook County Circuit Court, and Jonathan Swain left the Chicago Board of Election Commissioners.

rejected Raila's challenge to the Board's decision, Raila appealed to the Illinois Appellate Court.

While Raila's appeal was pending, the Cook County Board worked to inform voters that while Raila's name would appear on ballots (which had been printed before Raila's disqualification), she was not an official candidate for Assessor. Two weeks before the primary, the Board ordered that each election supply box (known as "Election Supply Carriers" or "ESCs") include hundreds of green notices to be handed to every voter, as well as several posters for display in each polling location, informing them that votes for Raila would not count. The green notice was also posted on the Cook County Clerk's Facebook page. The County Board further mailed over 40,000 blue absentee voter notices stating that votes for Raila would not count. In addition, eight days before the primary, the Chicago Board placed full-page ads in two newspapers with large circulation stating that votes for Raila would not count.

On March 14, 2018, six days before the primary, the Illinois Appellate Court reversed the County Board's decision. It remanded the case "solely for the purpose that the [County] Board fashion an appropriate remedy to ensure that votes cast for Raila at the March 20, 2018 Democratic primary are counted." R. 56 ¶ 63; *Raila v. Cook Cty. Officers Electoral Board*, 2018 IL App (1st) 180400-U (Mar. 14, 2018).

The County Board responded by printing new black-and-white notices for distribution at polling sites that removed the statement about votes for Raila not counting. These new notices were distributed to election judges when they came to the County Board office the weekend before the primary to pick up the keys necessary

3

to access the contents of the ESCs. The County Board told these "Key Election Judges" to distribute these new notices but, according to Raila, "willfully and intentionally did not instruct the Key Election Judges to remove the green notices or not put up the posters" saying votes for Raila would not be counted. R. 56 ¶ 84.

In the days leading up to the primary, the Chicago Board did not run any new ads with any local media outlets correcting the prior ads or informing voters that votes for Raila would be counted. Furthermore, Raila alleges that for at least some time after the Illinois Appellate Court decision but before the primary, the Cook County Clerk's Facebook page still displayed the incorrect green notice.

On March 19, the day before the primary, the Cook County Clerk held a press conference and "told the media that it had been a mistake to allow the green notices to be placed in the election supply boxes." R. 56 ¶ 87. The Clerk said the mistake would be corrected by using the new black-and-white notices on primary day itself. The Clerk told Raila by phone that emails would be sent to election judges at all polling locations instructing them to only give out the black-and-white notices. However, Raila alleges that as of March 19, many polling places had not received the corrected notices, and that the promised emails "either did not get sent, were not received, or were ignored in many polling locations." R. 56 ¶ 91. Raila alleges that the "failure to address the issue and ensure that corrected notices were distributed was a reckless and intentional act to keep Ms. Raila from her right to run in a free and fair election." R. 56 ¶ 91.

4

The night before the primary, the Cook County Clerk informed Raila that a pre-programmed text message would be sent to all election judges the morning of the primary telling them to only hand out the corrected black-and-white notices. However, the next morning, the text message sent out stated the opposite: "This is a message from Election Central—Hand Out the *Green 'NOTICE to All Democratic Voters'* Thank you. – Chicago BOE." R. 56 ¶ 99. As a result, for several hours that morning, at least some voters were given incorrect notices stating that votes for Raila would not count, before subsequent messages were sent with correct instructions. The Chicago Board later held a press conference stating that the initial message was "an error." R. 56 ¶ 107.

Raila alleges that the collective actions and inactions of the County and City Boards in the time between the Illinois Appellate Court's decision and the primary itself were "deliberate and willful" and were motivated by a desire to "bolster the candidacy of another challenger to the incumbent." R. 56 ¶¶ 108, 110. That challenger was Fritz Kaegi, who ultimately won the nomination and had been "openly and publicly supported" by then-Cook County Clerk David Orr. R. 56 ¶ 111.

The TAC contains four counts. Count I asserts a violation of Raila's First Amendment right to free association by restricting her access to a place on the ballot. R. 56 ¶¶ 117-29. Count II asserts a violation of Raila's Fourteenth Amendment rights in that she was treated "differently from other similarly situated individuals, namely the other candidates for Assessor." R. 56 ¶¶ 130-143. Count III asserts a violation of the Illinois Election Code, 10 ILCS 5/29-17, in that she was deprived of the equal

5

protection of the laws. R. 56 ¶¶ 144-51. Finally, Count IV does not assert an independent claim but seeks injunctive relief in the form of an impartial monitor to oversee elections in Cook County and the City of Chicago. R. 56 ¶¶ 152-55.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Analysis

As the Court previously held, to the extent Raila's claims are based on conduct that occurred prior the Illinois Appellate Court's March 14, 2018 ruling, they are barred by res judicata. R. 37. Raila has not challenged this finding. Rather, in her motion for leave to file an amended complaint, Raila explained, "To address the Court's ruling based on *res judicata*, the proposed amended complaint contains allegations **solely based** on the Defendants' conduct after the Illinois state appellate court issued its ruling on March 14, 2018. These violations are new independent causes of action that could not have been raised during the prior state court proceedings." R. 53 ¶ 5 (emphasis added). Understandably, the Third Amended Complaint still contains (and this opinion recounts) factual allegations predating the March 14, 2018 ruling for necessary context. However, for the purposes of the instant motions, the Court considers whether Raila has stated plausible claims premised only on conduct post-dating that decision.

Defendants urge the Court to dismiss Raila's complaint as an election contest in disguise, one that should have been brought in state court under Illinois's established election contest framework. *See* 10 ILCS 5/7-63. They warn that Raila's suit is merely a long-delayed invitation for this Court to overrule the 2018 Cook County Assessor Democratic primary. Raila responds that **Defendants** are in fact the ones doing the dressing-up, seeking to hide a genuine constitutional deprivation by cloaking it in state election affairs.

The reticence of federal courts to intrude on state election matters is well established. *See Dieckhoff v. Severson*, 915 F.2d 1145, 1148 (7th Cir. 1990) ("When a

7

litigant invokes § 1983 and challenges in federal court the conduct of a state or local election, the federal court is faced with, among other policy concerns, the difficult task of balancing the protection of the fundamental right to vote enshrined in the first and fourteenth amendments with the avoidance of excessive entanglement of federal courts in state and local election matters (i.e., federalism)."). This has led to a general hands-off approach in cases involving the "dirty tricks" inherent in politics. *See Jones v. Markiewicz-Qualkinbush*, 982 F.3d 935, 939 (7th Cir. 2018) ("It is impossible to imagine the judiciary attempting to decide when a politically retaliatory step goes 'too far' without displacing the people's right to govern their own affairs and making the judiciary just another political tool for one faction to wield against its rivals."); *Manley v. Law*, 889 F. 3d 885, 889 (7th Cir. 2018) ("The Constitution does not guarantee good feelings or regulate manners in political disputes."). The same is true for claims premised on "'malfunctions' of the electoral process." *See Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986) ("The Constitution is not an election fraud statute.").

This latter category includes cases involving technical or logistical problems, and even those where election laws are not strictly followed. For example, in *Hennings v. Grafton*, the plaintiffs alleged "inaccurate tabulation of votes and 'arbitrary' action by the defendant county clerk as chief election official, all stemming directly or indirectly from the malfunctioning of electronic voting devices that were being used for the first time" and allegedly did not meet state requirements. *Hennings v. Grafton*, 523 F.2d 861, 863 (7th Cir. 1975). The court held that plaintiffs' claims

8

did not "rise to the level of a constitutional violation" because they were "at most irregularities caused by mechanical or human error and lacking in invidious or fraudulent intent." *Id.* at 864. Similarly, in *Dieckhoff*, the plaintiffs brought constitutional claims based on the county clerk's failure to strictly adhere to the statutory notice and timing requirements for a referendum. 915 F.2d at 1148-49. The court rejected these "maladministration" claims, citing evidence that the defendant had attempted in good faith to satisfy both statutes. *Id.*

On the other hand, "willful conduct which undermines the organic processes by which candidates are elected" may give rise to a constitutional claim, notwithstanding the "political issues" involved. *Hennings*, 523 F.2d at 864. Classic examples are vote dilution through malapportioned voting districts or discrimination against a specific class of voters. *Id.* (citing cases). Courts have also recognized a narrow class of "fraud on the voters" cases that implicate the Constitution. *See Rudisill v. Flynn*, 619 F.2d 692, 694 (7th Cir. 1980). One such case is *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973) (Per curiam). There, plaintiff Smith sought the Democratic nomination for the 12th Illinois Senatorial District, which had been reorganized by redistricting a year earlier. *Id.* at 1100. Smith lost the primary to Cherry, but before the general election, Cherry withdrew from the race. *Id.* Under state law, the members of the 12th Senatorial Committee (of which Cherry was a member) were authorized to designate a replacement, and they selected Palmer, a former senator from the 13th District whose residence had been relocated to the 12th District in redistricting. *Id.* Smith alleged that Palmer and the 12th Senatorial

9

Committee conspired to put Cherry on the primary ballot as a "sham or stand-in candidate," with every intent to replace Cherry with Palmer after the primary. *Id.*

The 7th Circuit found that Smith had a valid cause of action, noting that the alleged scheme amounted to "deception on the face of the ballot" and discriminated against Smith and his voters. *Id.* at 1102-03. It also abridged the voting rights of those voters who would have selected Cherry but not Palmer, since "[t]hose who thought they were voting for Cherry were as a practical matter voting for whomever the Committeemen might thereafter select; in effect, votes intended for Cherry were really votes for Palmer." *Id.* at 1102.

*Smith* seemingly offers a hook for Raila's claims, which are, in effect, that Defendants fraudulently misled voters into thinking that they could not vote for Raila even though she was on the ballot. Indeed, on their face, Raila's allegations fit neatly into the "crucial factors" underpinning *Smith*: "(1) the fraud was intimately connected with the ballot, (2) had the purpose and effect of deceiving voters as to the actual effect of their votes, and (3) had the intended result of favoring one relatively distinct group of voters over others." *Rudisill*, 619 F.2d at 694. But later cases have largely circumscribed *Smith* to its facts, calling it a "bolt from the blue" and questioning its continued viability. *See Gonzales v. Madigan*, 990 F.3d 561, 565 (7th Cir. 2021) ("We need not decide today whether *Smith* should be overruled, but we are confident that it should not be extended."). This hardly inspires confidence in its application here,

10

such that this Court cannot say that Raila's claims are viable simply because they check the appropriate boxes.³ *Rudisill*, 619 F.2d at 694.

Nonetheless, even if *Smith* will not carry the day for Raila, her claims are distinguishable from those involving typical political machinations. Raila has alleged that a sizeable portion of primary voters were falsely told, by election officials at their polling places, that Raila was not an official candidate. This is not, for example, a case of crafty manipulation of the ballot referendum limit to frustrate an opponent's campaign, which could have been repudiated by voters. *See Jones*, 892 F.3d at 938-39. No such "political" response was available for Raila. Thus, the remaining question is whether Raila has alleged mere "maladministration" of the 2018 primary, or the sort of willful conduct that can pass muster under § 1983.

This Court previously dismissed Raila's complaint because it did not plead willfulness at all. R. 37, at 12. The TAC now contains several explicit allegations to this effect. *See, e.g.*, R. 56 ¶ 84 (alleging that the County Board "willfully and intentionally" did not tell election judges to remove the erroneous green notices from the ESCs); ¶ 108 (alleging that the City Board deliberately and willfully sent the erroneous text message on the morning of the primary). However, reviewing these allegations collectively, the Court finds that Raila has not plausibly alleged willful conduct intended to undermine her campaign in the 2018 primary.

---

³ It may also explain why Raila did not cite *Smith* in her briefing despite its outwardly favorable holding.

11

Many of Raila's allegations are conclusory. Raila's contention that willfulness "can be seen" in Defendants' failure to take certain actions in advance of the primary is simply a declaration of how the Court should interpret those actions. R. 56 ¶ 113. Likewise for her assertion that a willful plot against her is the "only explanation" for the erroneous text message. R. 56 ¶ 112. Other allegations are speculative, such as the assertion that the promised emails regarding the notices "either did not get sent, were not received, or were ignored in many polling locations." R. 56 ¶ 91. These statements carry little weight in the Court's assessment. *Iqbal*, 556 U.S. at 678-79.

Furthermore, Raila's own allegations frequently contradict her claims of a willful conspiracy to impede her campaign. For example, while Raila claims that election officials willfully and deliberately chose not to tell election judges to remove or dispose of the erroneous green notices, it's undisputed that those same officials ***did*** tell the election judges to distribute the new, correct notices. Similarly, Raila's allegation that the City Board intentionally sent the erroneous text message on the morning of the primary is undercut a few paragraphs later when she says that the Board held a press conference calling the text an "error."

The Court is sensitive to the rule that it must accept Raila's factual allegations as true and draw reasonable inferences in her favor. *Iqbal*, 556 U.S. at 678. But the Court does not approach this case, nor indeed any other, with naiveté as though it only sprang into existence hours ago. "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Here the Court

retrieves Hanlon's Razor from its sheath. The inference Raila seeks—that the various blunders in the lead-up to the primary were the product of a deliberate and nefarious conspiracy—simply isn't reasonable in light of the facts she alleges, which include multiple *mea culpa* press conferences and several affirmative efforts affirming Raila's candidacy. The truth is that here, "the election officials' actions sound more like incompetence than election fraud." *Bodine*, 788 F.2d at 1272. That administrative mistakes occurred is understandable given the circumstances. The County and City Boards had less than a week to respond to the Illinois Appellate Court's decision, which was itself filed, argued, and decided in the span of roughly two weeks. *Cf. Dieckhoff*, 915 F.2d at 1149 (finding that county clerk's efforts to comply with procedural requirements were frustrated by back-and-forth litigation). Furthermore, the task of implementing the on-the-ground fixes fell largely on the shoulders of volunteers, no doubt well-intentioned but with limited formal training and, in this case, some clear lapses in leadership. *Cf. Hennings*, 523 F.2d at 865 (noting that "errors and irregularities" are "inevitable" in elections staffed by volunteers, and that "no constitutional guarantee exists to remedy them").[4]

The Court does not mean to minimize what occurred in the 2018 primary. The possibility that voters were given incorrect information at the time they cast their ballots is troubling and should not be brushed aside as a "*de minimis* inconvenience"

---

[4] Having found that Raila has not sufficiently alleged willful conduct, the Court need not consider Defendants' other arguments for dismissal, such as whether Raila has sufficiently alleged *Monell* liability or properly sued individual Board members.

to First Amendment rights. R. 80, at 9 (quoting *Dempsey v. Johnson*, 69 N.E.3d 236, 246 (Ill. App. Ct. 2016)). But while the Defendants in this case may bear some responsibility for those issues (to the extent those officials remain in their positions), accountability will not come in the form of this § 1983 action.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss [68, 74] are granted. Having already allowed opportunity to amend, and there appearing no set of facts that Raila can plead to entitle her to relief, her claims are dismissed with prejudice.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 8, 2021